CADWALADER, WICKERSHAM & TAFT LLP
John J. Rapisardi, Esq.
Scott J. Greenberg, Esq.
One World Financial Center
New York, New York  10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Peter Friedman, Esq. (pro hac vice pending)
700 Sixth Street, N.W.
Washington, D.C.  20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

*Attorneys for Yucaipa Corporate Initiatives Fund II, L.P.*
*and Yucaipa Corporate Initiatives (Parallel) Fund II, L.P.*

SCHULTE ROTH & ZABEL LLP
Adam C. Harris, Esq.
Meghan Breen, Esq.
919 Third Avenue
New York, New York  10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

*Attorneys for CF ICBC LLC, Fortress Credit Funding I L.P.,*
*and Drawbridge Special Opportunities Fund Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x

| | |
|---|---|
| **In re:** : | |
| : | **Chapter 11** |
| **INNER CITY MEDIA CORPORATION,** : | |
| : | **Case No. 11-13967 (SCC)** |
| **Alleged Debtor.** : | |

-------------------------------------------------------------------------x

| | |
|---|---|
| **In re:** : | |
| : | **Chapter 11** |
| **ICBC BROADCAST HOLDINGS, INC.,** : | |
| : | **Case No. 11-13968 (SCC)** |
| **Alleged Debtor.** : | |

-------------------------------------------------------------------------x

---------------------------------------------x
       :

**In re:**       :

       :

**INNER-CITY BROADCASTING**       :    **Chapter 11**
**CORPORATION OF BERKELEY,**       :

       :    **Case No. 11-13972 (SCC)**

          **Alleged Debtor.**       :

---------------------------------------------x

**In re:**       :

       :    **Chapter 11**

**ICBC BROADCAST HOLDINGS-CA, INC.,**       :

       :    **Case No. 11-13969 (SCC)**

          **Alleged Debtor.**       :

       :

---------------------------------------------x

**In re:**       :

       :    **Chapter 11**

**ICBC-NY, L.L.C.,**       :

       :    **Case No. 11-13971 (SCC)**

          **Alleged Debtor.**       :

       :

---------------------------------------------x

**In re:**       :

       :    **Chapter 11**

**ICBC BROADCAST HOLDINGS-NY, INC.,**       :

       :    **Case No. 11-13970 (SCC)**

          **Alleged Debtor.**       :

       :

---------------------------------------------x

**In re:**       :

       :    **Chapter 11**

**URBAN RADIO, L.L.C.,**       :

       :    **Case No. 11-13979 (SCC)**

          **Alleged Debtor.**       :

       :

---------------------------------------------x

```
----------------------------------------------------x
                                                    :
In re:                                              :
                                                    :    Chapter 11
URBAN RADIO I, L.L.C.,                               :
                                                    :    Case No. 11-13973 (SCC)
                          Alleged Debtor.           :
----------------------------------------------------x
                                                    :
In re:                                              :
                                                    :    Chapter 11
URBAN RADIO II, L.L.C.,                              :
                                                    :    Case No. 11-13974 (SCC)
                          Alleged Debtor.           :
                                                    :
----------------------------------------------------x
                                                    :
In re:                                              :
                                                    :    Chapter 11
URBAN RADIO III, L.L.C.,                             :
                                                    :    Case No. 11-13975 (SCC)
                          Alleged Debtor.           :
                                                    :
----------------------------------------------------x
                                                    :
In re:                                              :
                                                    :    Chapter 11
URBAN RADIO IV, L.L.C.,                              :
                                                    :    Case No. 11-13976 (SCC)
                          Alleged Debtor.           :
                                                    :
----------------------------------------------------x
                                                    :
In re:                                              :
                                                    :    Chapter 11
URBAN RADIO OF MISSISSIPPI, L.L.C.,                  :
                                                    :    Case No. 11-13977 (SCC)
                          Alleged Debtor.           :
                                                    :
----------------------------------------------------x
```

```
-------------------------------------------------------------------x
In re:                                        :
                                              :
URBAN RADIO OF SOUTH                          :     Chapter 11
CAROLINA, L.L.C.,                             :
                                              :     Case No. 11-13978 (SCC)
                  Alleged Debtor.             :
                                              :
-------------------------------------------------------------------x
```

## PETITIONING CREDITORS' MOTION PURSUANT TO SECTIONS 105(a) AND 303(f) OF THE BANKRUPTCY CODE FOR ENTRY OF AN ORDER CONDITIONING THE ALLEGED DEBTORS' USE OF CASH IN CERTAIN DEPOSIT ACCOUNTS CONSTITUTING PROCEEDS OF COLLATERAL OTHER THAN IN THE ORDINARY COURSE OF BUSINESS PENDING DETERMINATION REGARDING ENTRY OF ORDERS FOR RELIEF

The Petitioning Creditors[1] are lenders (in such capacity, the "Senior Lenders") under the Senior Secured Credit Facility (as defined below) and submit this motion for entry of an order conditioning the use of cash proceeds (which constitute the Senior Lenders' collateral) generated from operations and contained in certain deposit accounts by Inner City Media Corporation ("ICMC") and certain of its affiliates (collectively, the "Alleged Debtors")[2] on certain parameters set out below pending this Court's determination of whether orders for relief should be entered against the Alleged Debtors. In support of the Motion, the Senior Lenders respectfully represent as follows:

---

[1] The Petitioning Creditors are Yucaipa Corporate Initiatives Fund II, L.P., Yucaipa Corporate Initiatives (Parallel) Fund II, L.P., CF ICBC LLC, Fortress Credit Funding I L.P., and Drawbridge Special Opportunities Fund Ltd.

[2] The Alleged Debtors in these chapter 11 cases are Inner City Media Corporation, ICBC Broadcast Holdings, Inc., Inner City Broadcasting Corporation of Berkeley, ICBC Broadcasting – CA, Inc., ICBC-NY, L.L.C., ICBC Broadcasting – NY, Inc., Urban Radio, L.L.C., Urban Radio I, L.L.C., Urban Radio II, L.L.C., Urban Radio III, L.L.C., Urban Radio IV, L.L.C., Urban Radio of Mississippi, L.L.C., and Urban Radio of South Carolina, L.L.C..

## PRELIMINARY STATEMENT

1.      As set forth in the Petitioning Creditors' Statement in Support (as defined below), the Alleged Debtors and the chairman of their ultimate parent company are continuing a pattern of reckless and disturbing behavior that forced the Petitioning Creditors to file involuntary chapter 11 petitions against the Alleged Debtors.

2.      This course of conduct has been orchestrated by Pierre "Pepe" Sutton, the chairman of the Alleged Debtors' parent company, Inner City Broadcasting Corporation ("ICBC"). Mr. Sutton has used the Alleged Debtors to enrich himself and continues to use his power over them to frustrate a necessary and appropriate restructuring of the Alleged Debtors' financial obligations. And Mr. Sutton and ICBC continue to exercise untoward control over the Alleged Debtors, forcing the Alleged Debtors to put the interests of ICBC ahead of the Alleged Debtors' creditors, to whom the Alleged Debtors owe fiduciary duties given the Alleged Debtors' obvious insolvency.[3] This includes using ICBC funds to pay hefty retainers to the Alleged Debtors' newly hired restructuring counsel. So long as Mr. Sutton remains in a position of power over the Alleged Debtors, the Senior Lenders' interests in the Alleged Debtors are imperiled. Indeed, presumably at Mr. Sutton's direction, counsel for the Alleged Debtors went so far as to threaten to file chapter 7 petitions and take actions before the Federal Communications Commission ("FCC") that would jeopardize the Alleged Debtors' broadcast licenses, likely their most valuable asset. These actions show a serious and outright disregard for the best interests of the Alleged Debtors, their estates and their creditors.

3.      To prevent further harm to the Senior Lenders' rights until this Court can determine whether orders for relief should be entered, the Senior Lenders request that the Court

---

[3] The Senior Lenders are prepared to submit evidence regarding the current value of the Alleged Debtors, and how deeply out of the money equityholders at all levels of the Alleged Debtors are.

exercise its power pursuant to 11 U.S.C. §303(f) and place certain common-sense restrictions on the Alleged Debtors' use of cash proceeds of the Senior Lenders' collateral.[4]

4. Specifically, the Senior Lenders request that until an order for relief is entered, the Alleged Debtors be prohibited from making:

- any transfer of cash directly to, or for the benefit of, ICBC or any officer, director or equityholder of ICBC;

- any payment of the fees or expenses of any professional retained in whole or in part by ICBC or who is performing work for, or for the benefit of, ICBC;

- any expenditure on account of salary, life insurance policies or other fringe benefits for Pepe Sutton, particularly until it can be determined whether Mr. Sutton's extremely high compensation is justifiable, and whether the Alleged Debtors – as opposed to ICBC – obtain any benefit for the expense;

- any expenditure on life insurance policies for any employee of the Alleged Debtors;

- any expenditure for corporate communications specialists providing services regarding the involuntary chapter 11 cases;

- any payment of the fees or expenses of Akin Gump and Rothschild Inc. given that they have already been paid substantial retainers of $800,000 in the aggregate, which were paid by ICBC, not the Alleged Debtors; and

- any reimbursement for executive employees of the Alleged Debtors for travel, parking, gas or other travel and entertainment expenses until such time as the Alleged Debtors have demonstrated that they have appropriate internal controls and policies in place with respect to such reimbursements.

5. The Senior Lenders recognize that during the so-called "gap period" – the time between the filing of an involuntary petition and the entry of an order for relief – an alleged debtor is generally permitted to use its property pursuant to 11 U.S.C. § 303(f). But an alleged

---

[4] If orders for relief are entered by the Court, this cash would constitute "cash collateral" under section 363(e) of the Bankruptcy Code, and its use would be conditioned upon the granting of adequate protection that would normally include most of the limitations and restrictions requested herein.

debtor's conduct must comport with its fiduciary duties, and must not destroy value or dissipate assets to benefit equityholders at the expense of creditors.[5] The protective provisions sought by the Senior Lenders are necessary to ensure that the Alleged Debtors do not spend excessively or dissipate assets which constitute the collateral of the Senior Lenders, and are appropriate under the circumstances.[6]

## **BACKGROUND**

6. A detailed factual background of the events leading to the Petitioning Creditors' decision to commence these involuntary cases is set forth in the "Statement of Petitioning Creditors in Support of the Involuntary Chapter 11 Petitions Filed Against Inner City Media Corporation and Certain of Its Affiliates" (the "Statement in Support"), which was filed with the Court on August 20, 2011 and is attached without exhibits as Exhibit A. An abbreviated set of facts is set out below.

7. The Senior Lenders are lenders under that certain Credit Agreement dated as of August 13, 2004 (as amended, modified, and supplemented thereafter, the "Senior Secured Credit Facility").[7] As of the filing of the involuntary petitions against the Alleged Debtors, the aggregate amount of the principal and accrued and unpaid interest and fees outstanding under the Senior Secured Credit Facility is approximately $250,000,000.

---

[5] In the instant cases before the Court, the Senior Lenders will demonstrate that based upon valuation of the Alleged Debtors' enterprise, the Senior Lenders are undersecured by millions of dollars. There are no other free or unencumbered assets held by the Alleged Debtors and, as a result, there is no distributable value beyond the Senior Lender level. Hence, the Alleged Debtors' fiduciary duties run directly to the Senior Lenders. See, e.g., RSL Comm'cns PLC v. Bildirici, 649 F.Supp.2d 184, 202 (S.D.N.Y. 2009).

[6] As set forth in the Statement in Support, the Senior Lenders are prepared to file a plan of reorganization that provides for a substantial de-leveraging of the Alleged Debtors' outstanding debt as well as the payment in full of all administrative expenses and general unsecured claims.

[7] Except as otherwise noted, capitalized terms used but not defined herein shall have the meanings set forth in the Senior Secured Credit Facility.

8. Pursuant to certain collateral documents executed in connection with the Senior Secured Credit Facility, including, without limitation, the Control Agreements (as defined in the Statement in Support) and that certain Security Agreement, dated as of August 13, 2004, by and between the Alleged Debtors and the Agent, the Obligations under the Senior Secured Credit Facility are secured by first priority liens on substantially all of the Alleged Debtors' assets, including, but not limited to, real property, equipment, cash or cash equivalents on deposit in certain of the Alleged Debtors' deposit accounts (the "Accounts"), intellectual property, and certain pledged equity interests and all rights in respect thereof.  As of the commencement of these cases, the Senior Lenders hold security interests in and control rights over the Accounts.

9. The Obligations under the Senior Secured Credit Facility are also guaranteed by several subsidiaries of ICBC Broadcast Holdings, Inc. (the borrower under the Senior Secured Credit Facility) and ICMC (the direct parent of ICBC Broadcast Holdings, Inc.).

**Prepetition Defaults**

10. The Alleged Debtors have been in default under the Senior Secured Credit Facility for more than two years and have not voluntarily made an interest or principal payment under the Senior Secured Credit Facility since March 31, 2009.  The Senior Secured Credit Facility is fully matured and all of the Obligations are due and owing.

**Prepetition Negotiations**

11. Given the outstanding defaults and the dissipation of the Alleged Debtors' value to the point where the Senior Lenders are substantially undersecured, the Senior Lenders sought to engage the Alleged Debtors in a consensual restructuring.  Ultimately, a consensual deal was reached.  However, as described in the Statement in Support, the Alleged Debtors first signed and then, in a last-minute usurpation of authority by Mr. Sutton, backed out of an agreed-

to restructuring term sheet for a pre-packaged bankruptcy that would have paid administrative, priority and unsecured creditors in full and provided recoveries to existing equity (to which existing equity had no legal entitlement). Indeed, this was apparently done at the express behest of Pepe Sutton to further entrench the Alleged Debtors' existing equityholders and management and extract additional hold-up value from the Senior Lenders. ICBC's decision to disaffirm this agreement was a serious breach of the Alleged Debtors' fiduciary duties owed to the Senior Lenders. Upon information and belief, certain members of the ICMC board were forced to resign and were replaced upon the order of Mr. Sutton, and simultaneously, the Alleged Debtors fired or forced to resign their existing legal counsel and restructuring advisor – each of which had been paid or incurred millions of dollars in fees.[8] The Alleged Debtors then apparently retained new legal and restructuring advisors.[9] Immediately after new counsel made its presence known, it sent a letter to counsel for the Senior Lenders on August 17 threatening, among other things, to proceed before the FCC and have the Alleged Debtors' licenses rendered ineffective and, even more egregious, to commence chapter 7 cases. At this stage, a chapter 7 filing would have had no economic rationale from the Alleged Debtors' perspective, would have caused harm to the Senior Lenders and unsecured creditors, and jeopardized the Alleged Debtors' operations and employees.

12.      What the Senior Lenders now know is that when the chapter 7 and FCC license threats were made, *the Alleged Debtors' counsel was not being paid by the Alleged Debtors, but by their parent company – ICBC* – the same entity that caused the Senior Lenders'

---

[8] It is uncertain whether members of the ICMC board were also summarily dismissed by Mr. Sutton. The Senior Lenders intend to pursue discovery on this issue.

[9] The exact timing of when the Alleged Debtors retained new legal and restructuring advisors is unclear. Upon information and belief, while Skadden and Alvarez & Marsal were still engaged by ICMC, Akin and Rothschild may have been involved in these matters and advising Pepe Sutton and ICBC weeks before Skadden and Alvarez & Marsal departed.

restructuring proposal to be rejected despite having already been approved by the board of ICMC (the operating company). Not only has ICBC paid the Alleged Debtors' counsel, it is also paying the Alleged Debtors' financial advisor. Together, these advisors have received approximately $800,000 from ICBC. Moreover, upon information and belief, the newly appointed directors of ICBC and ICMC also received retainers from ICBC. The Senior Lenders intend to take discovery to further investigate this state of affairs and obvious misalignment of interest.

**Filing of the Involuntary Petitions**

13. In light of all that has transpired over the past few months, on August 19, 2011, the Senior Lenders filed involuntary petitions under chapter 11 of the Bankruptcy Code against each of the Alleged Debtors. Despite the obvious need for the Alleged Debtors to convert these cases into voluntary chapter 11 cases, no order for relief has yet been entered.

14. Through communications with the Alleged Debtors, the Senior Lenders understand that the Alleged Debtors have in excess of $1 million in cash reserves, which exceeds the amount in reserve that the Alleged Debtors need to operate their businesses. These cash reserves will qualify as cash collateral pursuant to section 363(e) of the Bankruptcy Code upon entry of an order for relief. However, if the Alleged Debtors are permitted to spend their cash reserves without appropriate oversight from this Court they could cause severe and irreparable harm to themselves and the Senior Lenders' collateral, particularly if the Alleged Debtors continue to be operated by ICBC, Mr. Sutton and others whose interests are antithetical to those of the Senior Lenders and other creditors.

## JURISDICTION

15.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § l57(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

16.    The Senior Lenders respectfully request entry of an order, substantially in the form attached as Exhibit B, prohibiting the Alleged Debtors' use of the cash contained in the Accounts except as set forth therein pending this Court's determination of whether orders for relief should be entered against the Alleged Debtors.[10]

## BASIS FOR RELIEF REQUESTED

### THE COURT SHOULD RESTRICT THE ALLEGED DEBTORS' USE OF THE ACCOUNTS PENDING ENTRY OF AN ORDER FOR RELIEF

**A.    The Senior Lenders' Proposed Restrictions Are Authorized Under 11 U.S.C. §§ 105(a) and 303(f)**

17.    Section 303(f) of the Bankruptcy Code provides that in an involuntary bankruptcy case:

> Notwithstanding section 363 of [the Bankruptcy Code], except to the extent that the court orders otherwise, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire or dispose of property as if an involuntary case concerning the debtor had not been commenced.

11 U.S.C. § 303(f) (emphasis added).  Thus, the Bankruptcy Court has express power to oversee the Alleged Debtors' use of cash even during the involuntary gap period.

---

[10] In the event that the Alleged Debtors convert these cases to voluntary chapter 11 cases or the Court otherwise enters an order for relief granting the involuntary petitions, the restrictions requested herein should be continued pursuant to an appropriate order of the Court upon proper application by the Senior Lenders.

18.     Under section 303(f), "the court may prevent a debtor from controlling an asset during the 'gap period' between the filing of the involuntary petition and the entry of an order for relief." In re Hodes, 402 F.3d 1005, 1009 (10th Cir. 2005). The legislative history of section 303(f) indicates that imposition of restrictions under section 303(f) may be appropriate "where there is a fear that the debtor may attempt to abscond with assets, dispose of them at less than their fair market value, or dismantle his business, all to the detriment of the debtor's creditors." See In re C.W. Mining Co., No. 08-20105, 2008 WL 3539795, *3 n.7 (Bankr. D. Utah Aug. 7, 2008) (citing legislative history); In re DiLorenzo, III, 161 B.R. 752, 754 (Bankr. S.D.N.Y. 1993) (same); In re Beaucrest Realty Assocs, 4 B.R. 164, 165 (Bankr. E.D.N.Y. 1980) (same). Thus, "if the debtor is acting in a manner that suggests that the assets of the estate will be disposed of to the detriment of creditors, the court can limit the debtor's powers under section 303(f) as that subsection contemplates that the court can 'order otherwise.'" 2 COLLIER ON BANKRUPTCY ¶ 303.23[1] (16th ed. 2011). Further, pursuant to Bankruptcy Code section 105, the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a).

19.     The manner in which the Alleged Debtors are being controlled by ICBC and Mr. Sutton – who no longer have any economic interest in the Alleged Debtors and are simply using the Alleged Debtors to enrich themselves and extract hold-up value from the Senior Lenders – together with the threats previously made to file chapter 7 petitions and place the Alleged Debtors' FCC licenses at risk, surely suggests that there is a material threat that the Alleged Debtors' assets are at risk of being disposed of or diverted to the detriment of the Alleged Debtors' estates and creditors.

20.     Although there is limited authority interpreting section 303(f), the plain statutory text provides the bankruptcy court with extremely broad discretion to restrict an alleged debtor's conduct.   In considering the standard for granting relief under section 303(f), the Bankruptcy Court for the Eastern District of New York held that "after notice and hearing [a court may] impose certain restrictions on the activities of the debtor without unduly restricting the business." Beaucrest, 4 B.R. at 165 (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 323 (1977); Senate Rep. No. 95-989, 95th Cong., 2d Sess. 33 (1978), U.S.C.A.N. 1978, p. 5787). "Thus, the result obtained under [section] 303(f) is a balancing of the interests of the debtor with those of the creditors." Id. at 165.[11]

---

[11] In In re Dilley, 378 B.R. 1, 8 (Bankr. D. Me. 2007), the court suggested that a party seeking relief under section 303(f) was required to meet the standard for a preliminary injunction.  Nothing in the text of the statute suggests that a movant need to meet such a high burden, and the Senior Lenders believe that Diley is erroneous.  To the contrary, courts have held that seeking restrictions under section 303(f) is not akin to a request for an injunction.  See, e.g., In re C.W. Mining Co., 2008 WL 3539795 (Bankr. Utah 2008).  Nevertheless, if required, the Senior Lenders submit that the arguments set forth above demonstrate that (i) they would suffer irreparable injury if no supervision is imposed on the Alleged Debtors' use of cash because the Alleged Debtors may be spending scarce resources to benefit ICBC and Mr. Sutton or those working on their behalf, (ii) that there is no doubt that the proceeds at issue will qualify as cash collateral because the Alleged Debtors will have to consent to the filing of chapter 11 petitions given there financial state, and (iii) the balance of harms heavily favors the Senior Lenders, because the Senior Lenders are simply trying to ensure that the Alleged Debtors are only spending money to benefit the Alleged Debtors and not ICBC or Mr. Sutton.  The Senior Lenders explicitly are not trying to interfere with the ongoing ordinary course operations of the Alleged Debtors.  By establishing these three points, the Senior Lenders meet the Second Circuit's test for granting a preliminary injunction, which requires a showing of (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting preliminary relief. Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010) (noting that the "serious questions" standard has been well settled in the Second Circuit for the last five decades); Zino Davidoff SA v. CVS Corporation, 571 F.3d 239, 242 (2d Cir. 2009).

Further, certain courts have held that the standard for granting relief under section 303(f) are equivalent to what must shown to justify the appointment of a chapter 11 trustee under section 1104(a) of the Bankruptcy Code.  See DiLorenzo, 161 at 755; Beaucrest, 4 B.R. at 165.  Again, nothing in section 303(f) or its legislative history suggests that a creditor must prove "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management" in order to obtain interim restrictions of the debtor's use of property during the gap period.  To the contrary, the legislative history provides that relief may be granted upon a showing that there is reasonable likelihood that the debtor will misappropriate assets, so long as such restrictions do not unduly restrict the debtor's business.  The Senior

21.     This "balancing of interest" favors the Senior Lenders because (i) the cash subject to this motion is proceeds of their collateral, and would constitute cash collateral if an order for relief is entered[12] and (ii) the Senior Lenders are only asking the Court to impose restrictions to ensure that the Alleged Debtors' cash will be used solely to benefit the Alleged Debtors, as it should be.  Put another way, how can the Alleged Debtors legitimately object to being restricted to spending their cash only on themselves?[13]

**B.     The Senior Lenders' Proposed Restrictions Are Appropriate in Light of Current Circumstances And Will Not Harm the Alleged Debtors**

22.     The Senior Lenders' proposed restrictions are narrowly tailored and are designed to prevent ICBC and its shareholders from using the Alleged Debtors' money to enrich themselves or take actions adverse to the Alleged Debtors' interests.  None of these proposed conditions will deprive the Alleged Debtors of the ability to conduct normal business operations or act in the ordinary course.  Specifically, the Senior Lenders seek to prohibit only:

  i.    any transfer of cash directly to, or for the benefit of, ICBC or any officer, director or equityholder of ICBC;

  ii.   any payment of the fees or expenses of any professional retained in whole or in part by ICBC or who is performing work for, or for the benefit of, ICBC;

---

Lenders submit that the facts set forth herein and in the Statement in Support warrant the requested relief under this standard.

[12] Prior to the filing of the involuntary petitions, the Senior Lenders were entitled to exercise all rights and remedies under the Loan Documents, including, without limitation, the right to sweep or otherwise control the Alleged Debtors' use of cash in the Accounts.  It would be an odd result if, by virtue of the filing of involuntary petitions, the Senior Lenders were forced to relinquish such controls.

[13] The Senior Lenders are mindful that Bankruptcy Code section 549(a)(2) does provide a mechanism for recovery of inappropriate and unreasonable postpetition transactions entered in by the Alleged Debtors. However, the Senior Lenders believe that given the reckless conduct of the Alleged Debtors and their agents, prudence dictates that the line of what is appropriate and reasonable need be drawn now, and not at some later point in time.

iii.   any payment on account of salary, life insurance policies or other fringe benefits for Pepe Sutton, particularly until it can be determined whether Mr. Sutton's extremely high compensation is justifiable, and whether the Alleged Debtors – as opposed to ICBC – obtain any benefit for the expense;

iv.   any expenditure on life insurance policies for any employee of the Alleged Debtors;

v.   any expenditures for corporate communications specialists providing services regarding the involuntary chapter 11 cases;

vi.   any payment of the fees or expenses of Akin Gump and Rothschild Inc. given that they have already been paid substantial retainers of $800,000 in the aggregate, which were paid by ICBC, not the Alleged Debtors; and

vii.   any reimbursements for executive employees of the Alleged Debtors for travel, parking, gas or other travel and entertainment expenses until such time as the Alleged Debtors have demonstrated that they have appropriate internal controls and policies in place with respect to such reimbursements.

23.   Conditions (i)-(iv) are straightforward efforts to make sure that the Alleged Debtors' funds are not diverted to benefit ICBC, which is not an Alleged Debtor. Moreover, given that Mr. Sutton has – in his role as ICBC's chairman – ordered a course of actions directly adverse to the interests of ICMC and its creditors, ICMC should not be funding his exorbitant salary and the extremely large life insurance premiums that are being paid on Mr. Sutton's behalf.[14]

24.   Condition (v) is necessary because there is simply no need for the Alleged Debtors to engage a public relations or communications consultant at this point for purposes of a chapter 11 case.

25.   Condition (vi) – the limitation on professional fees and expenses of Akin and Rothschild – is warranted for two reasons. First, Akin and Rothschild have already received

---

[14] Upon information and belief, Pepe Sutton is the beneficiary of these life insurance policies paid by the Alleged Debtors, not the Alleged Debtors.

retainers of approximately $550,000 and $250,000, respectively, which were apparently paid by ICBC. In the short period of time before the Alleged Debtors inevitably consent to the petitions for relief, those amounts should readily suffice to prepare what should be very straightforward chapter 11 cases.[15] Moreover, serious questions exist about the retainers Akin and Rothschild received, again from ICBC. ICBC's payment of the Alleged Debtors' professionals creates an untenable conflict for those professionals (given that the Alleged Debtors owe their fiduciary duties to the Senior Lenders and other creditors, while ICBC and its chairman Mr. Sutton are acting to entrench themselves and extract value for existing equityholders to which such equityholders have no legal entitlement). Therefore, the Alleged Debtors should not be permitted to pay Akin and Rothschild additional funds until further investigation of this matter is completed.

26. Finally, condition (vii) – limitations on certain reimbursements – is appropriate given that the Senior Lenders understand that there is a lack of internal control or policies over these reimbursements in place at the Alleged Debtors right now. Until such time as policies are put in place, the Alleged Debtors should not be allowed to dissipate their remaining cash to enrich management by reimbursing them for potentially improper expenditures.

## NOTICE

27. Notice of this motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) counsel to the Alleged Debtors, (iii) counsel to the administrative agent under the Senior Secured Credit Facility, and (iv) all parties having filed requests for notices in these chapter 11 cases.

---

[15] The Senior Lenders reserve all rights with respect to the propriety (or lack thereof) of the Alleged Debtors' proposed retention of Akin and Rothschild in these cases.

## **NO PREVIOUS APPLICATION**

28.     No previous application for the relief requested herein has been made by the Senior Lenders to this or any other court.

*The remainder of this page is intentionally left blank.*

WHEREFORE, the Senior Lenders respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: August 24, 2011
      New York, New York

CADWALADER, WICKERSHAM & TAFT LLP

John J. Rapisardi, Esq.
Scott J. Greenberg, Esq.
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Email: john.rapisardi@cwt.com
          scott.greenberg@cwt.com

Peter Friedman, Esq. (pro hac vice pending)
700 Sixth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400
Email: peter.friedman@cwt.com

*Attorneys for Yucaipa Corporate Initiatives Fund II, L.P. and Yucaipa Corporate Initiatives (Parallel) Fund II, L.P.*

SCHULTE ROTH & ZABEL LLP
Adam C. Harris, Esq.
Meghan Breen, Esq.
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955
Email: adam.harris@srz.com

*Attorneys for CF ICBC LLC, Fortress Credit Funding I L.P., and Drawbridge Special Opportunities Fund Ltd.*

# **Exhibit A**

**Statement in Support**
**(excluding exhibits)**

CADWALADER, WICKERSHAM & TAFT LLP
John J. Rapisardi, Esq.
Scott J. Greenberg, Esq.
One World Financial Center
New York, New York  10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Peter Friedman, Esq. (pro hac vice pending)
700 Sixth Street, N.W.
Washington, D.C.  20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

*Attorneys for Yucaipa Corporate Initiatives Fund II, L.P.*
*and Yucaipa Corporate Initiatives (Parallel) Fund II, L.P.*

SCHULTE ROTH & ZABEL LLP
Adam C. Harris, Esq.
Meghan Breen, Esq.
919 Third Avenue
New York, New York  10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

*Attorneys for CF ICBC LLC, Fortress Credit Funding I L.P.,*
*and Drawbridge Special Opportunities Fund Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re:** | : | |
| | : | **Chapter 11** |
| **INNER CITY MEDIA CORPORATION,** | : | |
| | : | **Case No. 11-13967 ([___])** |
| **Alleged Debtor.** | : | |

--------------------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re:** | : | |
| | : | **Chapter 11** |
| **ICBC BROADCAST HOLDINGS, INC.,** | : | |
| | : | **Case No. 11-13968 ([___])** |
| **Alleged Debtor.** | : | |

--------------------------------------------------------------------------------x

```
--------------------------------------------------------x
                                        :
In re:                                  :
                                        :
INNER-CITY BROADCASTING                 :        Chapter 11
CORPORATION OF BERKELEY,                :
                                        :        Case No. 11-13972 ([___])
              Alleged Debtor.           :
                                        :
--------------------------------------------------------x

In re:                                  :
                                        :        Chapter 11
ICBC BROADCAST HOLDINGS-CA, INC.,       :
                                        :        Case No. 11-13969 ([___])
              Alleged Debtor.           :
                                        :
--------------------------------------------------------x

In re:                                  :
                                        :        Chapter 11
ICBC-NY, L.L.C.,                        :
                                        :        Case No. 11-13971 ([___])
              Alleged Debtor.           :
                                        :
--------------------------------------------------------x

In re:                                  :
                                        :        Chapter 11
ICBC BROADCAST HOLDINGS-NY, INC.,       :
                                        :        Case No. 11-13970 ([___])
              Alleged Debtor.           :
                                        :
--------------------------------------------------------x

In re:                                  :
                                        :        Chapter 11
URBAN RADIO, L.L.C.,                    :
                                        :        Case No. 11-13979 ([___])
              Alleged Debtor.           :
                                        :
--------------------------------------------------------x
```

```
------------------------------------------------------------x
                                             :
In re:                                       :
                                             :      Chapter 11
URBAN RADIO I, L.L.C.,                        :
                                             :      Case No. 11-13973 ([___])
              Alleged Debtor.                :
------------------------------------------------------------x

In re:                                       :
                                             :      Chapter 11
URBAN RADIO II, L.L.C.,                       :
                                             :      Case No. 11-13974 ([___])
              Alleged Debtor.                :
                                             :
------------------------------------------------------------x

In re:                                       :
                                             :      Chapter 11
URBAN RADIO III, L.L.C.,                      :
                                             :      Case No. 11-13975 ([___])
              Alleged Debtor.                :
                                             :
------------------------------------------------------------x

In re:                                       :
                                             :      Chapter 11
URBAN RADIO IV, L.L.C.,                       :
                                             :      Case No. 11-13976 ([___])
              Alleged Debtor.                :
                                             :
------------------------------------------------------------x

In re:                                       :
                                             :      Chapter 11
URBAN RADIO OF MISSISSIPPI, L.L.C.,           :
                                             :      Case No. 11-13977 ([___])
              Alleged Debtor.                :
                                             :
------------------------------------------------------------x
```

```
------------------------------------------------------------x
In re:                                 :
                                       :
URBAN RADIO OF SOUTH                   :      Chapter 11
CAROLINA, L.L.C.,                      :
                                       :      Case No. 11-13978 ([____])
              Alleged Debtor.          :
                                       :
------------------------------------------------------------x
```

**STATEMENT OF PETITIONING CREDITORS IN SUPPORT
OF THE INVOLUNTARY CHAPTER 11 PETITIONS FILED AGAINST
INNER CITY MEDIA CORPORATION AND CERTAIN OF ITS AFFILIATES**

The Petitioning Creditors[1] constitute the lenders (in such capacity, the "Senior Lenders") under the Senior Secured Credit Facility (as defined below), and respectfully submit this statement (i) in support of the involuntary chapter 11 petitions filed against Inner City Media Corporation ("ICMC") and certain of its affiliates (collectively, the "Alleged Debtors"),[2] and (ii) to assist the Court and other parties in interest in understanding the circumstances that led to commencement of these cases.

## INTRODUCTION

1.       The Petitioning Creditors are party to the Senior Secured Credit Facility pursuant to which they (or their predecessors in interest) extended $197 million in loans to the Alleged Debtors to be used for general corporate purposes.  More than two years ago, the Alleged Debtors defaulted under the Senior Secured Credit Facility, and in any event the entire

---

[1] The Petitioning Creditors are Yucaipa Corporate Initiatives Fund II, L.P., Yucaipa Corporate Initiatives (Parallel) Fund II, L.P., CF ICBC LLC, Fortress Credit Funding I L.P., and Drawbridge Special Opportunities Fund Ltd.

[2] The Alleged Debtors in these involuntary chapter 11 cases are Inner City Media Corporation, ICBC Broadcast Holdings, Inc., Inner-City Broadcasting Corporation of Berkeley, ICBC Broadcast Holdings–CA, Inc., ICBC-NY, L.L.C., ICBC Broadcast Holdings–NY, Inc., Urban Radio, L.L.C., Urban Radio I, L.L.C., Urban Radio II, L.L.C., Urban Radio III, L.L.C., Urban Radio IV, L.L.C., Urban Radio of Mississippi, L.L.C., and Urban Radio of South Carolina, L.L.C.

amount of principal and accrued and unpaid interest and fees became immediately due and payable on February 13, 2010. As a result, the Senior Lenders are owed approximately $250 million in principal and accrued and unpaid interest and fees as of the commencement of these cases. Moreover, as the Senior Lenders will demonstrate in these cases, the Alleged Debtors have been mismanaged and the value of the Senior Lenders' collateral has steadily decreased to the point where they are now substantially undersecured.

2. Despite having gone unpaid for years and being deeply undersecured, the Senior Lenders exercised extreme patience and refrained from exercising remedies under the Senior Secured Credit Facility – notwithstanding a clear right to do so – all in an effort to promote a spirit of genuine good faith, cooperation, and compromise and to give the parties ample opportunity to negotiate a consensual resolution.

3. These negotiations resulted in a proposal from the Senior Lenders that, had it been accepted and implemented by the Alleged Debtors, would have led to an orderly, prepackaged bankruptcy case resulting in prompt confirmation of a plan of reorganization and the restructuring of the Alleged Debtors as viable ongoing entities. Notwithstanding the fact that the Senior Lenders are at this point undersecured, the restructuring offer made by the Senior Lenders would have left unsecured creditors unimpaired and provided equityholders with a cash recovery and a continuing stake in the reorganized entities.

4. That proposal was initially accepted by the board of one of the Alleged Debtors (ICMC, the main operating company of the Alleged Debtors), and ICMC executed and delivered a signature page for a plan support agreement that would have implemented the proposed prepackaged bankruptcy. Upon information and belief, the Alleged Debtors' professionals at the time, Skadden Arps and Alvarez & Marsal, recommended to the board of

ICMC that it approve the restructuring proposal embedded in the plan support agreement. That restructuring proposal was clearly in the best interest of all constituencies, and would have provided a sound path forward for the Alleged Debtors, who are the owners of, among other things, culturally and historically significant urban radio stations in a variety of U.S. markets.

5. However, on the eve of moving forward with this orderly chapter 11 filing, the parent company of the Alleged Debtors, at the behest of the parent company's chairman, Mr. Pierre Sutton, forced the Alleged Debtors to back out of this deal, apparently to seek a greater recovery for himself and other existing shareholders. This decision was inexplicable, given that negotiation of the restructuring proposal had been ongoing for several months, all of the Alleged Debtors are insolvent and owe their fiduciary duties to creditors. Moreover, Mr. Sutton engineered removal of incumbent boards of directors at the Alleged Debtors and put in place new "professional" directors. And, after having gone through months of negotiations, existing restructuring advisors (including Skadden) either were dismissed or resigned and replaced with new "hired guns."

6. The most recent conduct of Mr. Sutton and the Alleged Debtors represent an ill-conceived strategy to exercise leverage over the Senior Lenders and allow incumbent shareholders and managers to entrench themselves and extract value to which they have no legal entitlement. Since the Alleged Debtors' withdrawal of their initial acceptance of the proposed restructuring, the Senior Lenders have been unnecessarily forced to incur significant legal fees and expenses in pursuing and protecting their legal rights and remedies. Moreover, rather than seeking the protections of a voluntary chapter 11 case, the Alleged Debtors have made disturbing written threats – *going so far as threatening to file chapter 7 petitions,* with the consequential devastating affects on the Debtors' employees and vendors, and seeking to destroy the Alleged

Debtors' Federal Communications Commission licenses, which are the bedrock of the Alleged Debtors' operations and value.[3]

7. Faced with these reckless threats, the Senior Lenders reluctantly concluded that they had no choice but to commence these involuntary chapter 11 cases. The Senior Lenders believe that the chapter 11 process will preserve the Alleged Debtors' value and assure its continued orderly operations and hopeful speedy emergence from bankruptcy. To facilitate an expedited exit, the Senior Lenders are prepared to seek relief from the Court in short order that would permit them to file a plan of reorganization predicated upon the concept of paying all allowed administrative expense, priority and general unsecured claims in full.

## STATEMENT IN SUPPORT

### Senior Secured Credit Facility and Related Documents

8. The Senior Lenders are lenders under the Credit Agreement among the Alleged Debtors, General Electric Capital Corporation, as administrative agent, and the lenders signatory to the Credit Agreement from time to time, dated as of August 13, 2004 (as amended as of each of September 27, 2004, November 11, 2004, May 5, 2005, October 6, 2006, and June 22, 2007, and as further amended, restated, modified, or supplemented from time to time, the "Senior Secured Credit Facility").[4] A copy of the Senior Secured Credit Facility is attached as Exhibit A.

_____

[3] As these events unfolded, the Senior Lenders acted to protect their cash collateral by asserting control over certain deposit accounts in which they have valid, perfected security interests. Certain funds from these accounts were rightfully applied toward the obligations under the Senior Secured Credit Facility in accordance with the underlying credit documents, while leaving the Alleged Debtors with more than sufficient cash to operate their businesses and satisfy ordinary course obligations. The Senior Lenders have not declined a single request for payment made by the Company. Indeed, upon information and belief, the Alleged Debtors' operations are cash flow neutral or positive and do not require significant withdrawals from the accounts in which the Senior Lenders are secured.

[4] Except as otherwise noted, capitalized terms used but not defined in this statement shall have the meanings set forth in the Senior Secured Credit Facility.

9. On July 1, 2011, General Electric Capital Corporation resigned as administrative agent under the Senior Secured Credit Facility and was succeeded by Cortland Capital Market Services LLC (the "Agent"). As of the filing of the involuntary petitions against the Alleged Debtors, the aggregate amount of the principal and accrued and unpaid interest and fees outstanding under the Senior Secured Credit Facility is approximately $250,000,000. The Senior Lenders hold 100% of the outstanding amounts. Accordingly, the Senior Lenders constitute Requisite Lenders under the Senior Secured Credit Facility and, pursuant to Section 8.2(b) of the Senior Secured Credit Facility, are authorized to direct the Agent to exercise any rights and remedies provided to the Agent under the Loan Documents or at law or equity.

10. Pursuant to certain collateral documents executed in connection with the Senior Secured Credit Facility, including, without limitation, the Control Agreements (as defined below) and the Security Agreement, dated as of August 13, 2004, by and between the Alleged Debtors and the Agent (as amended, restated, modified, or supplemented from time to time, the "Security Agreement"), the Obligations under the Senior Secured Credit Facility are secured by first priority liens on substantially all of the Alleged Debtors' assets, including, but not limited to, real property, equipment, cash or cash equivalents on deposit in certain of the Alleged Debtors' deposit accounts, including, without limitation, an account (the "JPM Account") at JPMorgan Chase Bank ("JPM") and an account (the "Citibank Account") at Citibank, N.A. ("Citibank") (together with the JPM Account and the Citibank Account, collectively, the "Accounts"), intellectual property, and certain pledged equity interests (collectively, the "Collateral").

11. The Accounts are subject to seven control agreements between the Agent, on behalf of the Senior Lenders, and certain depository institutions, including, without limitation,

the Blocked Account Control Agreement, dated as of August 13, 2004, related to the JPM Account, by and among ICBC Broadcast Holdings, Inc. ("Holdings"), JPM, and the Agent (as amended, restated, modified, or supplemented from time to time, the "JPM Agreement"), and the Blocked Account Agreement, dated as of October 15, 2004, related to the Citibank Account, by and among Citibank, ICBC Broadcast Holdings-CA, Inc., and the Agent (as amended, restated, modified, or supplemented from time to time, the "Citibank Agreement") (together with the JPM Agreement and the Citibank Agreement, collectively, the "Control Agreements"). Pursuant to the Control Agreements, the Senior Lenders have valid, perfected, and enforceable security interests in the cash and cash equivalents on deposit in the Accounts and, accordingly, funds in any of the Accounts over which the Agent has not asserted control constitute cash collateral (the "Cash Collateral"). The Control Agreements are attached as Exhibit B.

12. The Obligations under the Senior Secured Credit Facility are guaranteed by several subsidiaries of Holdings (the borrower under the Senior Secured Credit Facility) and ICMC (Holding's parent). Copies of the guaranties are attached as Exhibit C.

**Prepetition Defaults**

13. The Alleged Debtors have been in default under the Senior Secured Credit Facility for more than two years. These defaults include:

> failure to comply with certain financial covenants;
>
> failure to pay interest; and
>
> failure to make principal payments.

14. Indeed, the Alleged Debtors have not voluntarily made an interest or principal payment under the Senior Secured Credit Facility since March 31, 2009.

15. The Agent sent reservation of rights letters, dated February 18, 2009, April 14, 2009, June 8, 2009, July 15, 2009, October 8, 2009, and February 19, 2010, to Holdings and

its counsel (collectively, the "Reservation of Rights Letters"), pursuant to which the Agent notified Holdings that, among other things, certain Events of Default had occurred and were continuing. On February 13, 2010, all of the Obligations under the Senior Secured Credit Facility became immediately due and payable in full in accordance with the terms of the Senior Secured Credit Facility. Pursuant to the Reservation of Rights Letter dated as of February 19, 2010, the Agent, on behalf of the Senior Lenders, declared that all of the outstanding Obligations were immediately due and payable, and demanded that Holdings immediately repay in full all of the outstanding Obligations. The Reservation of Rights Letters are attached as Exhibit D.

**Prepetition Negotiations**

16.     In spite of the Alleged Debtors' prepetition defaults, the Senior Lenders hoped to craft a viable restructuring plan with the Alleged Debtors and avoid the costs, risks, and delay of a free fall chapter 11. The Senior Lenders' restructuring proposals all have been designed with the goal of keeping the Alleged Debtors as a going concern and de-leveraging their balance sheet. Except as noted below, the Senior Lenders refrained from exercising remedies under the Senior Secured Credit Facility during the prepetition default period, notwithstanding the absence of a formal forbearance agreement.

17.     For the last three months leading up to these chapter 11 cases, the Senior Lenders negotiated intensively and in good faith with the Alleged Debtors regarding the terms of a consensual restructuring. Over the course of the past several months, the Senior Lenders and the Alleged Debtors exchanged numerous drafts of a restructuring term sheet and a plan support agreement that provided for a comprehensive restructuring of the Alleged Debtors' obligations.

18.     The general structure of the consensual deal has remained the same since the parties began negotiating in earnest at the end of May 2011; expedited prearranged or

prepackaged chapter 11 cases, pursuant to which the Senior Lenders would receive a new note at a substantially reduced face amount and the majority of the equity in the reorganized entity, and existing equityholders would receive cash, a small equity stake and warrants for additional equity in the reorganized entity. Further, at the Alleged Debtors' request, the Senior Lenders agreed to render general unsecured claims unimpaired to ensure that the contemplated recovery to equityholders would be enforceable under a plan of reorganization. This framework was for the purpose of a consensual deal, as holders of general unsecured claims and equityholders are otherwise out of the money and not entitled to any recovery given the current valuation of the Alleged Debtors.

19. The economics of the proposal, however, evolved over the course of the parties' negotiations. Throughout negotiations, the Alleged Debtors' equityholders repeatedly pressed the Senior Lenders for greater recoveries. Ultimately, the Senior Lenders agreed to certain additional concessions in favor of the Alleged Debtors, resulting in a fully negotiated, consensual restructuring term sheet and plan support agreement, attached as <u>Exhibit E</u> (the "<u>Restructuring Proposal</u>")[5] that, among other things, granted the Alleged Debtors' equityholders (i) $1,200,000 in cash, (ii) 2% of the equity interests in the reorganized ICMC, and (iii) 5-year warrants for 6% of the common stock of the reorganized ICMC on the effective date of a chapter 11 plan, and provided for the adoption of a new management incentive plan, pursuant to which the management of the reorganized Alleged Debtors would be eligible to receive stock options for up to an additional 6% of the equity interests in reorganized ICMC.

---

[5] The Senior Lenders submit the Restructuring Proposal term sheet only as proof that the Alleged Debtors backed out of the their agreement and for no other purposes.

20.     The Restructuring Proposal also incorporated the proposed terms of a 5-year employment agreement for Mr. Pierre Sutton, chief executive officer and chairman of the board of directors of Holdings, ICMC, and ICMC parent, Inner City Broadcasting Corporation ("ICBC"), pursuant to which Mr. Sutton would (i) receive base compensation of $600,000 per year, (ii) 2% of the common stock of the reorganized ICMC, issued pursuant to the new management incentive plan, (iii) be entitled to participate in all health and dental insurance plans of the reorganized Alleged Debtors on the same terms and conditions as other senior executives, (iv) be entitled to $20,000 per year as an expense budget for business related travel expenses, and (v) be given the title of Chairman Emeritus.

**Events Precipitating the Chapter 11 Cases**

21.     The Senior Lenders were informed that the board of directors of ICMC was convening on August 10, 2010 to consider whether to approve the Restructuring Proposal. Despite numerous inquiries following that meeting, the Senior Lenders did not receive any information regarding the outcome of the ICMC board meeting until two days later on August 12, 2011.

22.     In the interim, the Senior Lenders took steps to protect their Collateral. To that end, pursuant to Section 8.2(vi) of the Senior Secured Credit Facility and Section 7(a) the Security Agreement, the Senior Lenders directed the Agent to assert control over the JPM Account.[6]

23.     Specifically, on August 11, 2011, the Senior Lenders sent the letter attached as Exhibit F to the Agent, directing the Agent to (i) deliver a shifting control notice to

---

[6] At the time, the JPM Account had more than $21 million on deposit, an amount which the Alleged Debtors had accumulated over several years while failing to make payments due and owing to the Senior Lenders.

JPM in accordance with Sections 2 and 10 of the JPM Agreement, (ii) retain all funds transferred by JPM into the Agent's account until further directed by the Senior Lenders, and (iii) following the Agent's receipt of $10 million from the JPM Account and until further directed by the Senior Lenders, authorize JPM to satisfy Holdings' requests to withdraw funds from the JPM Account. Pursuant to the terms of the JPM Agreement, control over the JPM Account was to shift to the Agent effective as of August 15, 2011.

24.     On August 12, 2011, Alleged Debtors' counsel, then Skadden, advised CWT that (i) the August 10, 2011 ICMC board meeting was continued without the ICMC board of directors having voted on whether to proceed with the Restructuring Proposal and (ii) the ICMC board of directors was reconvening on August 13, 2011 to vote on the Restructuring Proposal.

25.     To ensure that the ICMC board of directors did not misconstrue the Senior Lenders' decision to assert control over the JPM Account, the letter attached as Exhibit G was sent on August 12, 2011, to explain the Senior Lenders' rationale for their actions, and underscoring that the sweep of $10 million was consistent with the spirit and intent of the Restructuring Proposal (which had always contemplated prepetition payments to the Senior Lenders in the aggregate amount of $10 million).  The letter was further intended to assure the ICMC board of directors that the Senior Lenders stood ready and willing to proceed with the Restructuring Proposal.

26.     Soon after the letter was sent, Skadden acknowledged its receipt via the letter attached as Exhibit H, and later that same day, advised CWT of the Alleged Debtors' concern that, on and after August 15, 2011 (the date on which control over the JPM Account was scheduled to shift to the Agent), the Alleged Debtors' draw requests to the JPM Account would

not be satisfied and the Alleged Debtors' operations might be disrupted as a result.  Accordingly, to allay these fears, the Senior Lenders sent the letter attached as <u>Exhibit I</u>, confirming that, so long as the Restructuring Proposal was approved, the Senior Lenders' intended to coordinate with the Agent and JPM to ensure that JPM returned control of the JPM Account to the Alleged Debtors immediately following the Agent's receipt of $10 million from the JPM Account.

27.     Late in the afternoon on August 13, 2011, Skadden advised CWT that the ICMC board of directors, including all of the independent directors, had reconvened that day and voted to approve the Restructuring Proposal, as modified to remove the prepetition payments to the Senior Lenders aggregating $10 million in exchange for the Alleged Debtors' agreement that the Senior Lenders could retain the $10 million swept from the JPM Account and apply it to the Obligations.  On August 14, 2011, Skadden sent CWT a revised restructuring term sheet and plan support agreement, reflecting those changes attached as <u>Exhibit J</u>.[7]

28.     Following the affirmative vote of the ICMC board of directors, all that remained was for the board of directors of ICBC (i.e., the parent company) to also approve the Restructuring Proposal.  On August 15, 2011, the Senior Lenders received ICMC's signature page to the execution version of the plan support agreement, a copy of which is attached as <u>Exhibit K</u>, and Skadden advised CWT that the ICBC board of directors was convening on August 16, 2011 to consider the Restructuring Proposal.  On August 16, 2011, the Senior Lenders directed the Agent to apply the $10 million swept from the JPM Account to the Obligations, in accordance with Section 1.11(a) of the Senior Secured Credit Facility.

---

[7] The Senior Lenders submit the revised Restructuring Proposal term sheet only as proof that the Alleged Debtors backed out of the their agreement and for no other purposes.

29. Upon information and belief, shortly after the ICMC board meeting on August 13, 2011 – and entirely unbeknownst to the Senior Lenders – Mr. Sutton commandeered the ICBC board of directors in order to block any further progress toward a restructuring agreement. While the precise details of all that occurred in the 48 hours after ICMC's board meeting on August 13, 2011 are unclear, given the lack of communication from the Alleged Debtors, on information and belief, Mr. Sutton, as a member of the board of directors of ICBC, terminated the ICBC directorships of Charles M. Warfield (ICMC President and Chief Operations Officer), Lois Wright (ICMC Executive Vice President and General Counsel), and Edwin Shirley (a long-standing director of ICBC and ICMC), each of whom supported and voted in favor of the Restructuring Proposal in his or her capacity as director of ICMC, and installed new "professional" directors in their place. With Messrs. Warfield and Shirley and Ms. Wright removed from the ICBC (and possibly the ICMC) boards of directors, Mr. Sutton apparently proceeded to disavow the Restructuring Proposal, engage new restructuring counsel, Akin Gump Strauss Hauer & Feld LLP ("Akin"), and an investment bank, Rothschild, Inc., after having received counsel from Skadden and financial advisory services from Alvarez & Marsal for over three months.

30. The Senior Lenders first heard reports of Mr. Sutton's actions on August 16, 2011. Upon learning that the Restructuring Proposal was no longer supported by the Alleged Debtors, the Senior Lenders took reasonable measures to protect their rights to the Cash Collateral by sending the Agent the letter attached as Exhibit L that directed the Agent to (i) cease all actions to shift control of the JPM Account back to the Alleged Debtors and (ii) deliver an activation notice to Citibank, which initiated an automatic, daily sweep of all available funds on deposit in the Citibank Account. Further, the Senior Lenders directed the

Agent via the email attached as Exhibit M to sweep an additional $6 million from the JPM Account.

31.     The Senior Lenders did not receive official confirmation from the Alleged Debtors regarding the outcome of the ICBC board of directors meeting until the following day on August 17, 2011, when Akin sent the letter attached as Exhibit N (the "Akin Letter") to CWT. Pursuant to the Akin Letter, the Alleged Debtors asserted that the Senior Lenders' sweep of $10 million from the JPM Account impaired the Alleged Debtors' ability to conduct day-to-day operations, demanded that the Senior Lenders immediately return $10 million to the Alleged Debtors. Incredibly, the Alleged Debtors went so far as to threaten to file chapter 7 petitions and seek a declaratory judgment with the Federal Communications Commission that the Senior Lenders' actions resulted in a *de facto* change of control of the Alleged Debtors (thus threatening the Alleged Debtors' FCC licenses) in the event that the Senior Lenders declined to comply with the Alleged Debtors' demands. Prior to the Akin Letter, there had been no communication whatsoever from the Alleged Debtors to the Senior Lenders regarding the Alleged Debtors' plans or intentions with respect to the Restructuring Proposal.

32.     Later the same day, after CWT's attempts to reach Akin to discuss the Akin Letter were unsuccessful, the Senior Lenders sent the letter attached as Exhibit O to Akin, advising Akin that (i) the $10 million sweep from the JPM Account was effectuated after full disclosure to the Alleged Debtors' predecessor counsel, Skadden, (ii) the Senior Lenders were not aware of any of the Alleged Debtors' payment requests being denied by JPM as a result of the cash sweeps, and (iii) the Senior Lenders did not intend to return any swept cash. Furthermore, counsel for the Senior Lenders reached out to Akin only to receive no response. Indeed, the letter to Akin has been met with silence. Since the Senior Lenders first directed the

Agent to exercise control over the JPM Account on August 11, 2011, to the best of our knowledge, all payment requests by the Alleged Debtors have been honored and the Senior Lenders have never been advised by the Alleged Debtors or their counsel that the Alleged Debtors require additional cash in order to operate without interruption.

33.     In addition, to further protect their rights in the Cash Collateral and to prevent the Alleged Debtors from acting rashly after the filing of the involuntary chapter 11 petitions, the Senior Lenders directed the Agent to sweep an additional $4.5 million from the JPM Account and $400,000 from the Citibank Account on August 19, 2011.  These additional sweeps by the Senior Lenders are reasonable under the circumstances because the Alleged Debtors' recent financial performance data indicates that the Alleged Debtors' operations are cash neutral and, therefore, the Alleged Debtors will have sufficient funds to finance ongoing, ordinary course obligations.

34.     In light of all that has transpired over the past few months – and, in particular over just the last few days (including the Alleged Debtors' threats to shut their businesses and file chapter 7 cases) – the Senior Lenders arrived at the rational conclusion that involuntary chapter 11 cases were the only way to avoid the costly, value-destructive chapter 7 cases threatened by the Alleged Debtors, and the only means to break the apparent impasse caused by entrenched equityholders who have disregarded their fiduciary duties as directors and officers of the Alleged Debtors.  Thus, after over two years without any debt service payments, over one year of maturity, and several months of protracted, good faith negotiations with the Debtors, the Senior Lenders have commenced these chapter 11 cases reluctantly, as a method of last resort to preserve the value of the Collateral for all stakeholders and to drive an otherwise stagnate default situation forward to a successful resolution.

Dated: August 20, 2011
      New York, New York

CADWALADER, WICKERSHAM & TAFT LLP

  /s/ John J. Rapisardi
John J. Rapisardi, Esq.
Scott J. Greenberg, Esq.
One World Financial Center
New York, New York  10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Email: john.rapisardi@cwt.com
       scott.greenberg@cwt.com

Peter Friedman, Esq. (pro hac vice pending)
700 Sixth Street, N.W.
Washington, D.C.  20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400
Email: peter.friedman@cwt.com

*Attorneys for Yucaipa Corporate Initiatives Fund II, LP and Yucaipa Corporate Initiatives (Parallel) Fund II, LP*

SCHULTE ROTH & ZABEL LLP
Adam C. Harris, Esq.
Meghan Breen, Esq.
919 Third Avenue
New York, New York  10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955
Email: adam.harris@srz.com

*Attorneys for CF ICBC LLC, Fortress Credit Funding I LP, and Drawbridge Special Opportunities Fund Ltd.*

**Exhibit B**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

In re:

**INNER CITY MEDIA CORPORATION,**

        **Alleged Debtor.**

------------------------------------------------------------x

**Chapter 11**

**Case No. 11-13967 (SCC)**

In re:

**ICBC BROADCAST HOLDINGS, INC.,**

        **Alleged Debtor.**

------------------------------------------------------------x

**Chapter 11**

**Case No. 11-13968 (SCC)**

In re:

**INNER-CITY BROADCASTING**
**CORPORATION OF BERKELEY,**

        **Alleged Debtor.**

------------------------------------------------------------x

**Chapter 11**

**Case No. 11-13972 (SCC)**

In re:

**ICBC BROADCAST HOLDINGS-CA, INC.,**

        **Alleged Debtor.**

------------------------------------------------------------x

**Chapter 11**

**Case No. 11-13969 (SCC)**

In re:

**ICBC-NY, L.L.C.,**

        **Alleged Debtor.**

------------------------------------------------------------x

**Chapter 11**

**Case No. 11-13971 (SCC)**

```
---------------------------------------x
In re:                                 :
                                       :      Chapter 11
ICBC BROADCAST HOLDINGS-NY, INC.,       :
                                       :      Case No. 11-13970 (SCC)
         Alleged Debtor.               :
                                       :
                                       :
---------------------------------------x

In re:                                 :
                                       :      Chapter 11
URBAN RADIO, L.L.C.,                    :
                                       :      Case No. 11-13979 (SCC)
         Alleged Debtor.               :
                                       :
                                       :
---------------------------------------x

                                       :
In re:                                 :
                                       :      Chapter 11
URBAN RADIO I, L.L.C.,                  :
                                       :      Case No. 11-13973 (SCC)
         Alleged Debtor.               :
                                       :
---------------------------------------x

In re:                                 :
                                       :      Chapter 11
URBAN RADIO II, L.L.C.,                 :
                                       :      Case No. 11-13974 (SCC)
         Alleged Debtor.               :
                                       :
                                       :
---------------------------------------x

In re:                                 :
                                       :      Chapter 11
URBAN RADIO III, L.L.C.,                :
                                       :      Case No. 11-13975 (SCC)
         Alleged Debtor.               :
                                       :
                                       :
---------------------------------------x
```

```
---------------------------------------------------------------x
In re:                              :
                                    :   Chapter 11
URBAN RADIO IV, L.L.C.,             :
                                    :   Case No. 11-13976 (SCC)
                   Alleged Debtor.  :
                                    :
---------------------------------------------------------------x
In re:                              :
                                    :   Chapter 11
URBAN RADIO OF MISSISSIPPI, L.L.C., :
                                    :   Case No. 11-13977 (SCC)
                   Alleged Debtor.  :
                                    :
---------------------------------------------------------------x
In re:                              :
                                    :
URBAN RADIO OF SOUTH                :   Chapter 11
CAROLINA, L.L.C.,                   :
                                    :   Case No. 11-13978 (SCC)
                   Alleged Debtor.  :
                                    :
---------------------------------------------------------------x
```

### ORDER PURSUANT TO SECTIONS 105(a) AND 303(f) OF THE BANKRUPTCY CODE CONDITIONING THE ALLEGED DEBTORS' USE OF CASH IN CERTAIN DEPOSIT ACCOUNTS CONSTITUTING PROCEEDS OF COLLATERAL OTHER THAN IN THE ORDINARY COURSE OF BUSINESS <u>PENDING DETERMINATION REGARDING ENTRY OF ORDERS FOR RELIEF</u>

Upon the motion, dated August 24, 2011 (the "<u>Motion</u>"),[1] of the Senior Lenders,

pursuant to sections 105(a) and 303(f) of the Bankruptcy Code, for entry of an order conditioning

the Alleged Debtors' use of cash proceeds (which constitutes the Senior Lenders' collateral)

generated from operations and contained in certain deposit accounts on certain parameters set out

in the Motion pending this Court's determination of whether orders for relief should be entered

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

against the Alleged Debtors, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided pursuant to this Court's "Order Shortening Time For Notice" to (i) the Office of the United States Trustee for the Southern District of New York, (ii) counsel to the Alleged Debtors, (iii) counsel to the administrative agent under the Senior Secured Credit Facility, and (iv) all parties having filed requests for notices in these chapter 11 cases, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief requested in the Motion is warranted and in the best interests of the Alleged Debtors, their estates and creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that all objections and responses, if any, to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections and responses, are overruled on the merits and denied with prejudice; and it is further

ORDERED that, pursuant to sections 105(a) and 303(f) of the Bankruptcy Code, pending this Court's determination of whether orders for relief should be entered against the Alleged Debtors, the Alleged Debtors shall be prohibited from making:

(a)    any transfer of cash directly to, or for the benefit of, ICBC or any officer, director or equityholder of ICBC;

(b)    any payment of the fees or expenses of any professional retained in whole or in part by ICBC or who is performing work for, or for the benefit of, ICBC;

(c)    any payment on account of salary, life insurance policies or other fringe benefits for Pepe Sutton, particularly until it can be determined whether Mr. Sutton's extremely high compensation is justifiable, and whether the Alleged Debtors – as opposed to ICBC – obtain any benefit for the expense;

(d)    any expenditure on life insurance policies for any employee of the Alleged Debtors;

(e)    any expenditures for corporate communications specialists providing services regarding the involuntary chapter 11 cases;

(f)    any payment of the fees or expenses of Akin Gump and Rothschild Inc. given that they have already been paid substantial retainers, which were paid by ICBC, not the Alleged Debtors; and

(g)    any reimbursements for executive employees of the Alleged Debtors for travel, parking, gas or other travel and entertainment expenses until such time as the Alleged Debtors have demonstrated that they have appropriate internal controls and policies in place with respect to such reimbursements; and it is further

ORDERED that this Order shall be effective and enforceable immediately upon entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: _____, 2011
      New York, New York

_____
THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE