AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff, Esq.
Abid Qureshi, Esq.
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

- and -

AKIN GUMP STRAUSS HAUER & FELD LLP
Scott L. Alberino, Esq. (*pro hac vice pending*)
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

*Attorneys for the Alleged Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

............................................................... x

                    :

**In re:**

                    :    **Chapter 11**

**INNER CITY MEDIA CORPORATION,**

                    :    **Case No. 11-13967 (SCC)**

        **Alleged Debtor.**

                    :

............................................................... x

                    :

**In re:**

                    :    **Chapter 11**

**ICBC BROADCAST HOLDINGS, INC.,**

                    :    **Case No. 11-13968 (SCC)**

        **Alleged Debtor.**

                    :

............................................................... x

```
.............................................................. x
                                                               :
In re:                                                         :
                                                               :    **Chapter 11**
**INNER-CITY BROADCASTING**                                    :
**CORPORATION OF BERKELEY,**                                   :    **Case No. 11-13972 (SCC)**
                                                               :
            **Alleged Debtor.**                                :
.............................................................. x
                                                               :
In re:                                                         :
                                                               :    **Chapter 11**
**ICBC BROADCAST HOLDINGS-CA, INC.,**                          :
                                                               :    **Case No. 11-13969 (SCC)**
            **Alleged Debtor.**                                :
                                                               :
.............................................................. x
                                                               :
In re:                                                         :
                                                               :    **Chapter 11**
**ICBC-NY, L.L.C.,**                                           :
                                                               :    **Case No. 11-13971 (SCC)**
            **Alleged Debtor.**                                :
.............................................................. x
                                                               :
In re:                                                         :
                                                               :    **Chapter 11**
**ICBC BROADCAST HOLDINGS-NY, INC.,**                          :
                                                               :    **Case No. 11-13970 (SCC)**
            **Alleged Debtor.**                                :
                                                               :
.............................................................. x
                                                               :
In re:                                                         :
                                                               :    **Chapter 11**
**URBAN RADIO, L.L.C.,**                                       :
                                                               :    **Case No. 11-13979 (SCC)**
            **Alleged Debtor.**                                :
                                                               :
.............................................................. x
```

2

```
......................................................... x
                                                         :
In re:
                                                         :    Chapter 11
URBAN RADIO I, L.L.C.,
                                                         :    Case No. 11-13973 (SCC)
                    Alleged Debtor.
                                                         :
......................................................... x
                                                         :
In re:
                                                         :    Chapter 11
URBAN RADIO II, L.L.C.,
                                                         :    Case No. 11-13974 (SCC)
                    Alleged Debtor.
                                                         :
......................................................... x
                                                         :
In re:
                                                         :    Chapter 11
URBAN RADIO III, L.L.C.,
                                                         :    Case No. 11-13975 (SCC)
                    Alleged Debtor.
                                                         :
......................................................... x
                                                         :
In re:
                                                         :    Chapter 11
URBAN RADIO IV, L.L.C.,
                                                         :    Case No. 11-13976 (SCC)
                    Alleged Debtor.
                                                         :
......................................................... x
                                                         :
In re:
                                                         :    Chapter 11
URBAN RADIO OF MISSISSIPPI, L.L.C.,
                                                         :    Case No. 11-13977 (SCC)
                    Alleged Debtor.
                                                         :
......................................................... x
```

```
..................................................................... x
                                                    :
In re:                                              :
                                                    :    Chapter 11
URBAN RADIO OF SOUTH                                 :
CAROLINA, L.L.C.,                                   :    Case No. 11-13978 (SCC)
                                                    :
                    Alleged Debtor.                 :
..................................................................... x
```

**ALLEGED DEBTORS' RESPONSE TO
PETITIONING CREDITORS' MOTION PURSUANT TO
SECTIONS 105(A) AND 303(F) OF THE BANKRUPTCY CODE
FOR ENTRY OF AN ORDER CONDITIONING THE ALLEGED DEBTORS'
USE OF CASH IN CERTAIN DEPOSIT ACCOUNTS CONSTITUTING PROCEEDS
OF COLLATERAL OTHER THAN IN THE ORDINARY COURSE OF BUSINESS
<u>PENDING DETERMINATION REGARDING ENTRY OF ORDERS FOR RELIEF</u>**

Inner City Media Corporation ("***ICMC***") and its above-captioned alleged debtor affiliates (collectively, the "***Alleged Debtors***"),[1] by and through their undersigned counsel, respectfully submit this response (the "***<u>Response</u>***") to the *Motion Pursuant to Sections 105(a) and 303(f) of the Bankruptcy Code for Entry of an Order Conditioning the Alleged Debtors' Use of Cash in Certain Deposit Accounts Constituting Proceeds of Collateral Other Than in the Ordinary Course of Business Pending Determination Regarding Entry of Orders for Relief* (the "***Motion***")[2] filed by certain owners of debt issued under the Alleged Debtors' secured credit facility (the "***Petitioners***").[3]  In support thereof, the Alleged Debtors respectfully state as follows:

---

[1]  The Alleged Debtors in these chapter 11 cases are Inner City Media Corporation, ICBC Broadcast Holdings, Inc., Inner City Broadcasting Corporation of Berkeley, ICBC Broadcast Holdings-CA, Inc., ICBC-NY, L.L.C., ICBC Broadcast Holdings-NY, Inc., Urban Radio, L.L.C., Urban Radio I, L.L.C., Urban Radio II, L.L.C., Urban Radio III, L.L.C., Urban Radio IV, L.L.C., Urban Radio of Mississippi, L.L.C., and Urban Radio of South Carolina, L.L.C.  However, although an involuntary petition was filed against ICBC Broadcasting – NY, Inc. ("***ICBC Broadcasting-NY***"), that corporate entity was merged into ICBC-NY, LLC in 2005, and therefore ICBC Broadcasting-NY no longer exists.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

[3]  The Petitioners are holders of debt outstanding under that certain Credit Agreement dated as of August 13, 2004 (the "***Credit Agreement***"), among ICBC Broadcast Holdings, Inc., Cortland Capital Market Services LLC (as successor to General Electric Capital Corporation, the "***Agent***") and the lenders from time to time party thereto.

101349820

## PRELIMINARY STATEMENT

The Motion should be denied, because the Petitioners will be unable to carry their high evidentiary burden to demonstrate that the Alleged Debtors, or any officers, directors or shareholders, are absconding with assets, disposing of assets at less than their fair market value or dismantling the business to the detriment of creditors. In fact, the evidence suggests just the opposite. Section 303(f) of the Bankruptcy Code protects alleged debtors by allowing them to continue to "use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced" subject to the power of the bankruptcy court to order otherwise. Most courts have been reluctant to "order otherwise" absent circumstances suggesting looting, theft and waste of the alleged debtor's business – the point being that an involuntary debtor does not have license to destroy value of the estate in response to the involuntary bankruptcy petition. Here, the Petitioners offer scant evidence of any wrongdoing and are not entitled to the extraordinary relief that they seek.

The Petitioners commenced these involuntary proceedings as part of an orchestrated strategy to impose a balance sheet restructuring on the Alleged Debtors, which was properly rejected following due deliberation by the Alleged Debtors in consultation with their legal and financial advisors. In lieu of returning to the bargaining table, the Petitioners took the extraordinary relief of sweeping virtually all of the Debtors' cash from approximately $21 million to slightly above $1 million, forcing the Alleged Debtors prematurely towards chapter 11; seeking the appointment of a chapter 11 trustee or examiner with expanded powers; and attempting to limit the Alleged Debtors' ability to pay, among other things, the salary and benefits of the chief executive officer. Through the Motion, the Petitioners also seek to choke off

---

The Petitioners include Yucaipa Corporate Initiatives Fund II, L.P., Yucaipa Corporate Initiatives (Parallel) Fund II, L.P., CF ICBC LLC, Fortress Credit Funding I L.P., and Drawbridge Special Opportunities Fund Ltd.

the Alleged Debtors' ability to pay the restructuring professionals they require in order to respond to the onslaught of legal proceedings initiated by the Petitioners and to prepare the Alleged Debtors for a smooth landing into chapter 11.

As indicated in the Declaration of Neil A. Augustine in support of this Response (the "***Augustine Declaration***"), the Alleged Debtors' management and restructuring professionals have been focused on attempting to preserve the value of the businesses and to prepare an appropriate response, consistent with their respective fiduciary and professional obligations, to return the restructuring negotiations to the conference room rather than destroy the Alleged Debtors through unnecessary and unjustified scorched-earth litigation. Furthermore, as indicated in the Augustine Declaration, the Alleged Debtors have prepared a 3-week budget (a copy of which is attached to the Proposed Order attached hereto as "Exhibit A") which will limit expenditures during the gap period to allow the Alleged Debtors to preserve going concern value and enable the Alleged Debtors to adequately prepare for chapter 11 and the contested matters which have been initiated and threatened by the Petitioners.

The Alleged Debtors' actions both prior to and subsequent to the commencement of the Involuntary Proceedings are inconsistent with the type of conduct that may cause a bankruptcy court to limit an alleged debtor's use of cash during the gap period. In addition, the Petitioners have failed to establish that the Alleged Debtors, its officers or directors are taking action to harm the business or the Alleged Debtors' estates. For these reasons, and the reasons cited below, the Alleged Debtors respectfully request that the Court enter an order denying the Motion, or alternatively, enter the Proposed Order.

## **BACKGROUND**

1.    Beginning in May 2011, certain managers of the Alleged Debtors and the Petitioners conducted negotiations on the terms of a potential consensual restructuring that

101349820

contemplated a prepackaged chapter 11 plan (the "***Proposed Restructuring***").  While the parties reached agreement on a number of business and legal issues, several key terms remained open and unresolved, including, in particular, (a) the allocation of equity between common and preferred stockholders, (b) the strike price of the warrants provided to old equityholders under the Proposed Restructuring, (c) the composition of the senior management team and the terms of their employment, (d) minority shareholder protections and (e) the covenants relating to the new debt facility contemplated under the Proposed Restructuring.

2.      On August 13, 2011, the board of directors of ICMC (the "***ICMC Board***") approved terms for a Proposed Restructuring,[4] subject to the consent of the board of directors of its parent company  (the "***Parent Board***"), Inner City Broadcasting Corporation ("***ICBC***").  On August 15, 2011, while the Parent Board was still evaluating that proposal, the Petitioners instructed the Agent to sweep approximately $10 million from the Alleged Debtors' bank accounts and, moreover, used blocking agreements that the Agent had in place to freeze the Alleged Debtors' operating accounts.  As a result of these actions, the Alleged Debtors could not issue checks or make wire transfers without the Agent's approval.

3.      On August 16, 2011, the Parent Board rejected the Proposed Restructuring after discussion and presentations from legal and financial advisors.  On August 17, 2011, the Alleged Debtors' counsel sent a letter to the counsel for the Petitioners, insisting that the Petitioners return the $10 million of cash that was swept and release the frozen Alleged Debtor accounts to allow the Alleged Debtors to resume ordinary business operations.  The Petitioners replied by instructing the Agent to conduct <u>three</u> additional incremental cash sweeps from the Alleged Debtors' bank accounts on August 17, 18, and 19, 2011, bringing the total of swept cash to

---

[4]  The Alleged Debtors' dispute the validity of the ICMC Board's actions.

approximately $21 million.  The Agent also categorically refused to return any of the swept cash or return control of the Alleged Debtors' bank accounts.  These actions left the Alleged Debtors with only approximately $1 million in cash, substantially all of which was held in accounts over which they did not have control.

4.      After the final cash sweep, without any discussion or warning to the Alleged Debtors or their counsel, the Petitioners filed involuntary chapter 11 petitions against each of the Alleged Debtors in the middle of the night on August 19, 2011 (collectively, the "***Involuntary Proceedings***").

5.      On August 24, 2011, the Petitioners filed the Motion, seeking to prohibit certain types of payments and expenditures by the Alleged Debtors during the period pending this Court's determination of whether orders for relief should be entered against the Alleged Debtors (the "***Gap Period***").

## RESPONSE

**A.      Section 303(f) of the Bankruptcy Code Permits the Alleged Debtors to Continue Using Their Property in the Ordinary Course**

6.      Section 303(f) of the Bankruptcy Code provides that, unless the court orders otherwise, an alleged debtor is free to continue to operate his business and use, acquire and dispose of his property as if the involuntary petition was not filed.  11 U.S.C. § 363(f).  This Court has described that right as "[t]he most important protection given [an alleged debtor] by the Code."  *In re DiLorenzo*, 161 B.R. 752, 754 (Bankr. S.D.N.Y. 1993) (citing Benjamin Weintraub & Alan N. Resnick, *Bankruptcy Law Manual*, ¶ 2.14, at 2–43 (Warren, Gordon & Lamont, Inc., 3d ed. 1992)).  Indeed, the Motion cites no case where a Court from <u>any</u> jurisdiction has ever applied section 303(f) to limit an alleged debtor's ability to use its property in the manner sought by the Petitioners.

101349820

7.	Based on the legislative history of this statute, courts in this district have held that in order to deprive an alleged debtor of control over its assets under section 303(f), it must be "shown that he 'may attempt to abscond with assets, dispose of them at less than their fair market value, or dismantle his business, all to the detriment of [his] creditors.'" *Id.* (internal citation omitted).[5]  However, the Petitioners fail to provide evidence showing any dangers similar to the three described in that test.

8.	Instead, the Lenders assert that "***the manner*** in which the Alleged Debtors are being controlled by ICBC and Mr. Sutton … surely suggests that there is a material threat that the Alleged Debtors' assets are at risk … ."  Motion at ¶ 19 (emphasis added).  Essentially, the Lenders believe that the Alleged Debtors' exercise of their business judgment to reject the Restructuring Proposal was tantamount to absconding with the Alleged Debtors' assets or dismantling their businesses.

9.	As described above, however, the Alleged Debtors have consistently done the opposite -- taking prudent steps to try to preserve their assets' value in the face of hostile legal actions from the Petitioners.  First, the Alleged Debtors sought to negotiate a consensual pre-packaged restructuring to avoid the expenses and pitfalls of a freefall bankruptcy.  As those negotiations broke down, the Alleged Debtors hired a new restructuring counsel and financial

---

[5]  The Motion applies an inappropriate "balancing of interests" standard purportedly extracted from the *Beaucrest* decision.  Motion at ¶ 20.  In fact, *Beaucrest* sets forth the same legislative history test cited above, and remarks only that "the result obtained under s 303(f) is a balancing of the interests of the debtor with those of the creditors."  *In re Beaucrest Realty Assocs.*, 4 B.R. 164, 165 (Bankr. E.D.N.Y. 1980) (emphasis added).  No other case refers to this "balancing test" and *Beaucrest* itself suggests that the section 303(f) analysis considers "factors similar in nature to those specified in s 1104(a)(1) which authorizes the appointment of a trustee."  *Id.*

In footnote 11, the Motion posits that a party seeking relief under that statute is required to meet the standard for a preliminary injunction based on *In re Dilley*, 378 B.R. 1, 8 (Bankr. D. Me. 2007) and *In re C.W. Mining Co.*, 08-2015, 2008 WL 3539795 (Bankr. Utah Aug.7, 2008).  To the extent that this Court decides that a preliminary injunction standard is applicable, the Petitioners certainly have not met their high burden under that standard.

advisor to help complete negotiations with their primary creditor constituency. When nearly half of the Alleged Debtors' cash was swept and their bank accounts were effectively frozen, the Alleged Debtors demanded as forcefully as they could that these actions be reversed.[6] The Motion does not assert, nor could it, that at any time in this process the Alleged Debtors made or threatened to make any non-ordinary course transfers or destroy their businesses' value.[7]

**B.     The Petitioners' Proposed Restrictions Are Inappropriate and Have No Basis Under Section 303(f) of the Bankruptcy Code**

10.     The Motion seeks to impede the Alleged Debtors' ordinary-course business operations by prohibiting the following types of payments:

i.      any transfer of cash directly to, or for the benefit of, ICBC or any officer, director or equityholder of ICBC;

ii.     any payment of the fees or expenses of any professional retained in whole or in part by ICBC or who is performing work for or for the benefit of ICBC;

iii.    any payment on account of salary, life insurance policies or other fringe benefits for Pierre Sutton;

iv.     any expenditure on life insurance policies for any employee of the Alleged Debtors;

v.      any expenditures for corporate communications specialists providing services regarding the involuntary chapter 11 cases;

vi.     any payment of the fees or expenses of Akin Gump and Rothschild Inc. in addition to their initial retainers; and

vii.    any reimbursements for executive employees of the Alleged Debtors for travel, parking, gas or other travel and entertainment expenses until such time as the Alleged Debtors have demonstrated that they have appropriate

---

[6] In addition to concerns about the inability to use their cash freely, the Alleged Debtors feared that these actions could jeopardize their Federal Communications Commission licenses by effecting a *de facto* change of control that would violate license restrictions.

[7] To the extent that the Lenders have any concerns about the Alleged Debtors making inappropriate transactions during the gap period, the Motion itself notes that the Bankruptcy Code already provides an explicit remedy for avoiding such transfers under section 549(a)(2). Motion at 14 n. 13.

101349820

internal controls and policies in place with respect to such reimbursements.

Motion at ¶ 18.  Tellingly, none of these prohibitions was tailored to restrict the Alleged Debtors to ordinary course behavior; rather, the Petitioners seek to prohibit numerous forms of established practices that have been in place for years and that pose no risk of dissipation of estate assets.  Indeed, the primary effect of these prohibitions seems to be disrupting the Alleged Debtors' ability to operate their businesses and respond to the Petitioners' involuntary filings.

      i.    Although No Risk Exists, the Alleged Debtors Would Agree to Prohibit Transfers to Their Parent, and its Officers, Directors or Equityholders <u>Outside the Ordinary Course</u>

11.    Of these prohibitions, only the first one has any plausible connection to the dissipation of estate assets that section 303(f) seeks to prevent.  Although the Motion would prohibit any transfer of cash directly to, or for the benefit of, the Alleged Debtors' parent or any officer, director or equityholder thereof, the Motion contains no assertion that the Alleged Debtors have dissipated estate assets by such transfers in the past.  The Alleged Debtors also have no intention to do so now, so, to address any farfetched concerns of the Petitioners, the Alleged Debtors would consent to entry of the proposed order (the "***Proposed Order***") attached hereto as " Exhibit A" which would prohibit any transfers of cash to or for the benefit of ICBC, or its officers, directors or equityholders, outside the ordinary course of the Alleged Debtors' previous business transactions.

      ii.    The Alleged Debtors Should Be Permitted to Continue to Pay Their Chief <u>Executive Officer During the Gap Period in the Ordinary Course</u>

12.    The third prohibition the Petitioners request prevents the Alleged Debtors from continuing to pay, in the ordinary course, the salary, life insurance policies or other benefits that comprise Pierre Sutton's compensation as CEO of the Alleged Debtors.  In effect, the Petitioners are demanding that Mr. Sutton forego a salary as retaliation for the role they believed Mr. Sutton

played in connection with the Alleged Debtors' failure of the Parent Board to approve the Proposed Restructuring. Mr. Sutton's current compensation package has been in place since 2003, and it was approved by the ICMC Board. The Motion makes no assertion that the amounts he receives are exorbitant. Mr. Sutton's father founded the Alleged Debtors and Mr. Sutton has led the Alleged Debtors as their CEO since 1999. While the Petitioners may disagree with the business judgment that Mr. Sutton exercised, that in no way justifies the Court terminating his continued ordinary-course compensation. Since the Alleged Debtors have a short deadline to respond to the Involuntary Proceedings, their CEO should be allowed to focus his full attention and energies on the restructuring without the distractions of the Petitioners demanding that his compensation be withheld. Penalizing Mr. Sutton at this critical juncture would destroy the continuity and confidence necessary for the Alleged Debtors to make the smooth transition into chapter 11 that the Petitioners purport to desire.

> iii. The Alleged Debtors Should Be Permitted to Continue Ordinary Course Employee Compensation and Reimbursement Practices During the Gap Period

13. Prohibitions iv and vii above seek to prohibit the Alleged Debtors from continuing their existing ordinary-course employee compensation and expense reimbursement policies during the remaining two weeks of the Gap Period -- a period when it is most critical to maintain employee morale and confidence. The Petitioners have shown no basis that continuing to make ordinary-course employee life insurance payments or expense reimbursements pursuant to policies and practices that have been in place for years would dissipate estate assets during the pending Gap Period. On the contrary, the minimal costs associated with continuing these regular practices for a brief period are inconsequential in comparison to the potential damage to employee morale and confidence that could occur if these practices were immediately ceased. Debtors in chapter 11 proceedings routinely request and receive authorization to continue

compensating their employees pursuant to existing prepetition practices postpetition. The Petitioners have demonstrated no basis for the dramatic remedy of prohibiting the continuation of these ordinary practices even in this prepetition Gap Period.

           iv.    The Alleged Debtors Must Be Permitted to Pay the Reasonable Fees and Expenses of the Restructuring Professionals of Their Choice

14.    Prohibition vi above seeks to prevent the Alleged Debtors from paying the fees or expenses of their chosen restructuring counsel and financial advisors, Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**") and Rothschild, Inc. ("**Rothschild,**" and together with Akin Gump, the "**Restructuring Professionals**"). The Motion asserts that this restriction is necessary, because these restructuring professionals have already received retainers that the Petitioners believe should "readily suffice to prepare what should be very straightforward chapter 11 cases." Motion at ¶ 25. However, that is not the Petitioners' judgment to make. Akin Gump and Rothschild have been performing substantial work under their respective engagement letters, effective as of July 27, 2011 and August 10, 2011, respectively (together, the "**Engagement Letters**"). These Engagement Letters were negotiated between the Restructuring Professionals and the Alleged Debtors at arm's length. To the extent that the Restructuring Professionals' retainers are exhausted during the Gap Period, the Alleged Debtors must be able to replenish those retainers consistent with the terms of the Engagement Letters and customary industry practice in employment of restructuring professionals.

           v.    The Alleged Debtors Must Not Be Deprived of Their Right to Employ the Restructuring Professionals of Their Choice

15.    The principal purpose of the Petitioners' request - which is to prohibit the Alleged Debtors from paying the negotiated fees and expenses of the Restructuring Professionals - seems to be an effort to impermissibly restrict the Alleged Debtors' choice of advisors and to force the

Alleged Debtors to hand over control of these cases to the Petitioners. It is long-standing and well-settled law that the Alleged Debtors' choice of counsel should be disturbed in only the "rarest of cases." See *In re Mandell*, 69 F.2d 830, 831 (2d Cir. 1934) ("Only in rarest cases should the trustee be deprived of the privilege of selecting his own counsel . . ."); *Vergos v. Timber Creek, Inc.*, 200 B.R. 624, 628 (W.D. Tenn. 1996) ("The debtor's right to choose qualified counsel should be disturbed only in the rarest cases."); *In re Premier Farms, L.C.*, 305 B.R. 717 (Bankr. N.D. Iowa 2003) (same). This same principle applies with respect to the Alleged Debtors' selection of Rothschild (or any other professional). See *In re Diva Jewelry Design, Inc.*, 367 B.R. 463, 477 (Bankr. S.D.N.Y. 2007) ("The Bankruptcy Code expressly provides that a trustee may employ professionals to assist the trustee in carrying out his duties under the Code, and the trustee must have wide latitude in selecting his or her professionals."); *In re Caldor, Inc.*, 193 B.R. 165, 170 (Bankr. S.D.N.Y. 1996) ("Public policy favors permitting parties to retain professionals of their choice."). By trying to paint ICBC's payment to the Restructuring Professionals as a conflict of interest and by seeking to impose prohibitions on the payment of Restructuring Professionals, the Petitioners are attempting to improperly use section 303(f) to interfere with the Alleged Debtors' valuable right to retain the professionals of their choosing, and the Court should not countenance this bold overreaching.

> vi.    Akin Gump and Rothschild Have Represented the Alleged Debtors Appropriately

16.    Furthermore, the Petitioner's assertion "that "ICBC's payment of the Alleged Debtors' professionals creates an untenable conflict for those professionals" and a "misalignment of interests" is baseless. Motion at ¶¶ 12, 25. First, ICBC's payment of the Restructuring Professionals cannot create an "untenable conflict," because payment of one party's legal expenses by a third party, such as a parent, does not itself create a conflict. *See In re Lan Dan*

*Enters., Inc.*, 221 B.R. 93, 96 (Bankr. S.D.N.Y. 1998) (noting that "several courts have found that where an attorney for the debtor is compensated by a third party, it does not give rise to a per se impermissible conflict of interest."). The Petitioner's rank speculation that the Restructuring Professionals have acted in the best interests of anyone other than their clients must be rejected out of hand for what they are -- a transparent attempt to frustrate the Alleged Debtors' choice of professionals. The Petitioners offer no evidence at all that the Restructuring Professionals have taken any action which is inconsistent with duties owed to creditors of the Alleged Debtors' estates.

17.     <u>Second</u>, the Petitioners' implication that the Alleged Debtors' professional fees are excessive is unsubstantiated and meritless. The Alleged Debtors are paying their retained professionals' reasonable and necessary fees to ensure preservation of enterprise value and to adequately prepare for an orderly transition into Chapter 11 (which should ultimately benefit the Petitioners more than any other constituency). Furthermore, Petitioners fail to appreciate that a significant driver of costs in these cases are the various motions filed against the Debtors that have all been brought on expedited bases and for which the Petitioners have indicated an interest in pursuing extensive discovery.

18.     <u>Third</u>, the argument of "misalignment of interest" is premised on the faulty assumption that there was something improper about ICBC's rejection of the Restructuring Proposal. As discussed above, ICBC determined, in its independent judgment, that the Restructuring Proposal was not in its best interest. Furthermore, ICBC was a party and a required signatory to the proposed plan support agreement negotiated by the Petitioners so the Petitioners were aware that ICBC signoff was a prerequisite to an effective plan support agreement. The Petitioners' dissatisfaction with this outcome does not give the Petitioners the

right to impugn or interfere with the Alleged Debtors' choice of professionals.  Moreover, ICBC

has, at all relevant times, been represented by its own counsel, Meyer, Suozzi, English & Klein,

P.C., not Akin Gump.

        vii.    The Alleged Debtors Should Be Permitted to Pay for Necessary Corporate
                <u>Communications Consulting Services During the Gap Period</u>.

19.    The Motion asserts that expenditures for corporate communications specialists

providing services regarding the involuntary chapter 11 cases should be prohibited, because

"there is simply no need" for such services.  Motion at ¶ 24.  The Alleged Debtors respectfully

disagree -- the need for professional restructuring communications consultants could not be

greater.  The Petitioners have just filed involuntary chapter 11 cases against the Alleged Debtors

and made inflammatory allegations in public pleadings about the Alleged Debtors' business

practices and management.  Those filings and allegations have already been reported extensively

in the media.  Indeed, the Alleged Debtors operate culturally significant media companies and

are subjected to a heightened level of media attention.  The Alleged Debtors' business decision to

hire a communications consultant to control reputational damage done by the Petitioners and

these Involuntary Cases is an effort to preserve value in their assets, not dissipate it.

101349820

WHEREFORE, for the reasons set forth herein, the Alleged Debtors respectfully request that (i) the Court overrule the Motion and deny the relief requested therein, or, in the alternative, (ii) enter the Proposed Order attached hereto as <u>Exhibit A</u>, and (iii) grant such further relief as the Court deems is just and proper.

New York, New York
Dated:  August 30, 2011

AKIN GUMP STRAUSS HAUER & FELD LLP
By: /s/ *Ira S. Dizengoff*
Ira S. Dizengoff, Esq.
Abid Qureshi, Esq.
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile : (212) 872-1002
idizengoff@akingump.com
aqureshi@akingump.com

Scott L. Alberino, Esq. (*pro hac vice pending*)
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
salberino@akingump.com

*Attorneys for the Alleged Debtors*

101349820

**Exhibit A**

**Proposed Order**

101410488

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

.............................................................................. x

                                                :

**In re:**

                                                :     **Chapter 11**

**INNER CITY MEDIA CORPORATION,**

                                                  :     **Case No. 11-13967 (SCC)**

            **Alleged Debtor.**

                                                  :

.............................................................................. x

**ORDER PURSUANT TO**
**SECTIONS 105(a) AND 303(f) OF**
**THE BANKRUPTCY CODE CONDITIONING THE**
**ALLEGED DEBTORS' USE OF CERTAIN DEPOSIT**
**ACCOUNTS OTHER THAN IN THE ORDINARY COURSE**
<u>**OF BUSINESS PENDING ENTRY OF AN ORDER FOR RELIEF**</u>

        Upon the motion, dated August 24, 2011 (the "<u>Motion</u>"),[1] of the Senior Lenders, pursuant to sections 105(a) and 303(f) of the Bankruptcy Code, for entry of an order conditioning the Alleged Debtors' use of certain deposit accounts on certain parameters set out in the Motion pending entry of an order for relief, all as more fully set forth in the Motion; and the response to the Motion (the "<u>Response</u>") and the Declaration of Neil A. Augustine in Support of the Response (the "<u>Augustine Declaration</u>"), both filed by the Alleged Debtors on August 30, 2011; and the Court having jurisdiction to consider the Motion and the Response and relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the Response and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion and the Response having been provided to (i) the U.S. Trustee, (ii) counsel to the Alleged Debtors, (iii) counsel to the Senior Lenders, and (iv) all parties having filed requests for notices in these chapter 11 cases, and it appearing that no other

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

or further notice need be provided; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Alleged Debtors' expenditures shall be limited to such expenditures reflected in the budget attached hereto as Annex I (the "Gap Period Budget"), subject to a 10% line item variance with respect to each expenditure which can be carried forward to subsequent budget periods, commencing upon entry of the Order through and including the earliest to occur of (i) September 16, 2011, (ii) the date upon which the Alleged Debtors consent to entry of orders for relief under Chapter 11 of the Bankruptcy Code, and (iii) the date upon which the Court enters a dispositive ruling with respect to the involuntary petitions (with each of clauses (i), (ii) and (iii) being referred to herein as, a "Termination Event"); and it is further,

ORDERED that until the occurrence of a Termination Event, the Alleged Debtors shall be prohibited from making:

(a) any transfer of cash directly to ICBC or any officer, director or equity holder of ICBC, outside of the ordinary course the Alleged Debtors' business;

(b) any payment of the fees or expenses of any professional retained by ICBC for professional services being performed solely for the benefit of ICBC; and

(c) any reimbursements for executive employees of the Alleged Debtors for travel, parking, gas or other travel and entertainment expenses, which are inconsistent with the Alleged Debtors historical reimbursement practices; and it is further

ORDERED that this Order shall be effective and enforceable immediately upon entry; and it is further

2

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: _____, 2011
      New York, New York

_____
THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

101410488

**<u>Annex I</u>**

**Inner City Media Corporation**
**Consolidated ($000)**

| | 1 W/E 9/2/11 | 2 W/E 9/9/11 | 3 W/E 9/16/11 | 3-week Total |
|---|---|---|---|---|
| **Cash at beginning of period** | 1,275 | 984 | 273 | 1,275 |
| **Cash Receipts:** | | | | |
| Ad Revenue Collection | 733 | 860 | 860 | 2,453 |
| Syndication Profit Payment | - | - | - | - |
| Other Collections | - | - | - | - |
| **Total Receipts** | 733 | 860 | 860 | 2,453 |
| **Cash Disbursements** | | | | |
| **Operating** | | | | |
| Salaries, Wages | - | 674 | - | 674 |
| Payroll Taxes | - | 37 | - | 37 |
| Employee Benefits | 87 | 5 | 28 | 120 |
| Music License Fees, Syndication, Talent | 37 | 120 | 197 | 354 |
| National Rep Commission | - | - | 54 | 54 |
| Rent, Property Taxes, Insurance | 166 | 18 | 5 | 189 |
| Insurance Premium | 24 | - | - | 24 |
| Research | 4 | 71 | 15 | 90 |
| Audit, Tax, Legal Fees | 7 | 10 | 10 | 27 |
| Broadcasting Expenses | 4 | 6 | 6 | 16 |
| Advertising / Marketing | 10 | 11 | 12 | 33 |
| Travel & Entertainment | 13 | 5 | 20 | 38 |
| Auto Expense | 19 | 2 | 1 | 22 |
| Utilities | 20 | 20 | 20 | 60 |
| Repairs & Maintenance | 6 | 3 | 9 | 18 |
| Security | 4 | 2 | 2 | 8 |
| Equipment Rental & Computer Expense | 6 | 6 | 8 | 20 |
| Gifts/Contribution/Dues & Subscriptions | 70 | 2 | 4 | 76 |
| Taxes (Franchise, Sales, Use, Other) | - | - | 39 | 39 |
| Other Disbursements | 10 | 4 | 4 | 18 |
| Contingency | 25 | 25 | 25 | 75 |
| **Sub-total Operating Disbursements** | 512 | 1,021 | 459 | 1,992 |
| **Bankruptcy Disbursements[1]** | | | | |
| Debtor's Counsel | 485 | 400 | 250 | 1,135 |
| Creditors' Counsel | - | - | - | - |
| Debtor's Financial | 25 | 150 | 25 | 200 |
| Creditors' Financial | - | - | - | - |
| Noticing Agent | - | - | - | - |
| US Trustee | - | - | - | - |
| Utility Deposits | - | - | - | - |
| Public Affairs | - | - | - | - |
| Critical Vendor Payments | - | - | - | - |
| **Sub-total Bankruptcy Disbursements** | 510 | 550 | 275 | 1,335 |
| **Capital Expenditures** | 2 | - | 25 | 27 |
| **Total Disbursements** | 1,024 | 1,571 | 759 | 3,354 |
| **Weekly Cash Flow** | (291) | (711) | 101 | (901) |
| **Cash at end of period** | 984 | 273 | 374 | 374 |

[1]. The Bankruptcy Disbursements do not incorporate any contingent advisor fees.